# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| SYCAMORE IP HOLDINGS LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>AT&T CORP., et al.,<br><br>*Defendants*. | Case No. 2:16-CV-588-WCB<br>LEAD CASE |

## MEMORANDUM OPINION AND ORDER

Before the Court is <u>Defendant Level 3 Communications, LLC's Motion to Dismiss for Lack of Standing</u>, Dkt. No. 177. The motion is DENIED.

## I. Background

Level 3 Communications, LLC ("Level 3"), seeks dismissal of the complaint against it on the ground that plaintiff Sycamore IP Holdings LLC ("Sycamore IP") is merely a co-owner of asserted U.S. Patent No. 6,952,405 ("the '405 patent") and cannot bring this action without joining the other co-owner. According to Level 3, the other co-owner of the '405 patent is the Hong Kong University of Science and Technology ("HKUST" or "the University"). Because HKUST has not joined the action as a co-plaintiff, Level 3 contends that Sycamore IP lacks standing to bring this action on its own and that the action should therefore be dismissed. In the alternative, Level 3 makes the related claim that the action should be dismissed under Rule 19 of the Federal Rules of Civil Procedure because of Sycamore IP's failure to join HKUST as an indispensable party.

The other defendants in this consolidated action have not joined Level 3's motion. Moreover, HKUST has not taken a position with respect to the issue of patent ownership, and the

record does not reflect that HKUST has ever asserted any claim of an ownership interest in the '405 patent.

## II. Discussion

Section 281 of the Patent Act, 35 U.S.C. § 281, provides that "a patentee shall have remedy by civil action for infringement of his patent." That provision has been construed to require that any entity with an ownership interest in a patent must be joined in any infringement suit brought by another co-owner. Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1376–77 (Fed. Cir. 2000). The Federal Circuit sometimes refers to that doctrine as the "prudential standing" requirement, see WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 1265 & n.1 (Fed. Cir. 2010), or as "standing as defined by § 281 of the Patent Act," see Alps S., LLC v. Ohio Willow Wood Co., 787 F.3d 1379, 1382 (Fed. Cir. 2015). As applied to a case such as this one, the doctrine of prudential standing is based on the principle that each co-inventor "presumptively owns a pro rata undivided interest in the entire patent." Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998) (footnote omitted). For that reason, all of the co-owners of a patent must be joined in any action brought for infringement of the patent. Israel Bio-Eng'g Project v. Amgen Inc., 401 F.3d 1299, 1304–05 (Fed. Cir. 2005).

**1.** The factual basis for Level 3's theory of lack of prudential standing is as follows: The two named co-inventors of the '405 patent are Dr. Danny Tsang and Dr. Murat Azizoglu. They assigned their interests in the patent to Sycamore Networks. Sycamore Networks then assigned the patent to Dragon Intellectual Property, LLC, through which it was ultimately assigned to the plaintiff, Sycamore IP. There is no dispute that Dr. Azizoglu was a co-owner of the patent and therefore had an interest that could be conveyed to Sycamore Networks and ultimately to

2

Sycamore IP. With respect to Dr. Tsang's interest in the patent, however, the matter is more complicated.

Level 3 argues that Dr. Tsang, as a faculty member at HKUST, was bound by the University's Patent Policy, Dkt. No. 177-10 ("Patent Policy"), and that the effect of the Patent Policy was to make his interest in the patent the property of HKUST. Sycamore IP responds that Dr. Tsang was on University-approved unpaid sabbatical leave at the time he conceived of the invention and applied for the patent, and that Dr. Tsang's contribution to the invention was the product of his individual efforts during the course of his work for Sycamore Networks. Under HKUST's Patent Policy, according to Sycamore IP, Dr. Tsang's invention was not considered to have been made in the course of his University employment, and as a result, HKUST had no proprietary interest in the resulting patent.

Although the parties have submitted lengthy briefs on this issue, the Court regards the issue as turning on a straightforward reading of the HKUST's Patent Policy. The relevant portions of the Patent Policy read as follows:

> 1.4 Policy Applicability to Faculty, Staff and Students
> For the purpose of application of the Patent Policy of the Hong Kong University of Science and Technology, the term "Members of the University" is defined to include all part-time and full-time members of the faculty and staff and all other agents, employees, students, and fellows of the University. Subject to restrictions imposed by contracts with sponsoring organizations, the University shall have the sole right to determine the disposition of all inventions by the Members resulting from their employment or use of facilities administered by the University. . . .
>
> 1.5 Assignment of Rights
> All Members of the University as defined above shall, as a condition of employment with the University, assign all rights, title, and interest, to the extent prescribed in this policy, in any invention as defined herein to the University. . . .
> The University has vested the sole right to hold and, to transfer, the ownership of all intellectual properties (which term includes inventions and patents) generated by its faculty, students and employees in the Hong Kong University of Science and Technology RandD Corporation Limited; . . . .

3

1.6.2 University-Assigned Efforts

Ownership of inventions developed as a result of assigned institutional effort shall reside with the University; however, there shall be a sharing of royalty income with the inventor as an incentive to encourage further development of inventions. Any invention will be considered as having been developed as an assigned duty when conception and/or development are in the area of principal competence for which the individual is employed or for which the student is registered.

1.6.3 University-Assisted Individual Effort

Joint rights of ownership, and/or sharing of royalty income, shall occur where the University provides any support of an individual's effort resulting in an invention by the contribution of faculty or staff time, facilities, or institutional resources.

1.6.4 Individual Effort

Ownership of inventions generated entirely on personal time and solely as a result of individual initiative, not in an area of principal competence, and not as an institutional assignment and/or employment responsibilities nor involving the use of University facilities or resources as defined above, normally shall reside with the inventor. Members desiring to perform consulting work for outside organizations are required to obtain prior approval from the University and are cautioned not to sign a conflicting patent agreement. Inventions made or developed solely in the course of consulting work performed for outside organizations for which the approval of the University has been obtained shall not be considered as having been made or developed in the course of University employment unless otherwise specified. . . . Accordingly, all rights to such inventions other than those involving the use of HKUST Members, funds or facilities shall remain with the individual, or with the consulting sponsor.

Level 3 argues that the HKUST Patent Policy gave the University "the sole right to determine the disposition of all inventions by the Members resulting from their employment," section 1.4, and that all Members of the University were required to "assign all rights, title, and interest, to the extent prescribed in this policy, in any invention as defined herein to the University," section 1.5.[1] Even with respect to inventions "generated entirely on personal time," Level 3 argues, ownership of an invention would normally reside with the individual only if the

---

[1] Section 1.4 of the University's Patent Policy defines "Members of the University" to include "all part-time and full-time members of the faculty and staff and all other agents, employees, students and fellows of the University."

invention were "not in an area of principal competence, and not as an institutional assignment and/or employment responsibilities nor involving the use of University facilities or resources." Section 1.6.4 (first sentence). Because the invention in this case was in the field of electrical engineering, Dr. Tsang's area of "principal competence," Level 3 contends that the first sentence of section 1.6.4 of the Patent Policy would not apply, and that Dr. Tsang's invention would therefore belong to the University.

The Court disagrees. The language of the third sentence of section 1.6.4 of the Patent Policy is directed at exactly the situation presented here. That sentence provides that inventions "made or developed solely in the course of consulting work performed for outside organizations for which the approval of the University has been obtained" are not "considered as having been made or developed in the course of University employment." The final sentence of section 1.6.4 makes clear that in such situations, if the employee has not used HKUST employees, funds, or facilities to develop the inventions, "all rights to such inventions . . . shall remain with the individual, or with the consulting sponsor."

The record is clear that, with the prior approval of the University, Dr. Tsang took unpaid leave from the University and was employed during that period by Sycamore Networks.[2] Moreover, there is no dispute that the invention of the '405 patent was conceived and reduced to practice during that period. Because Dr. Tsang was performing consulting work for an outside organization with University approval, it is the third sentence of section 1.6.4 of the Patent

---

[2] The record does not contain the document that initially authorized Dr. Tsang's unpaid sabbatical leave, but it contains a document approving the shortening of his leave period, Dkt. No. 177-7, and that document makes clear that his leave was approved by the University on July 11, 2000, and that his leave, which began on September 1, 2000, was unpaid. The provisional application, to which the '405 patent claims priority, was filed on December 5, 2000, and the non-provisional application was filed on February 27, 2001. Dr. Tsang returned to HKUST on March 28, 2001.

5

Policy that applies to Dr. Tsang's situation, not the first sentence, on which Level 3 relies. For that reason, the proviso in the first sentence that makes that sentence applicable only if the invention in question is "not in an area of principal competence" does not apply to Dr. Tsang's situation. Indeed, it would be very odd for that proviso to apply to inventions made during a period of consultancy, because presumably members the University who are retained as consultants by outside organizations will be retained to perform work in their area of principal competence. Accordingly, reading the "area of principal competence" clause into the third sentence of section 1.6.4 would render that sentence inapplicable in virtually every case to which it would otherwise apply.

Focusing on other language in the first and second sentences of section 1.6.4 of the University's Patent Policy, Level 3 argues that Sycamore IP has failed to offer evidence that Dr. Tsang "obtained prior written consent from HKUST to sign a conflicting patent agreement to an invention within his area of principal competence." Dkt. No. 277, at 9. That argument conflates the provision of the Patent Policy regarding approval for leave and consultancy work with the provision that cautions the employee "not to sign a conflicting patent agreement." As noted, the evidence is sufficient to support Sycamore IP's position that Dr. Tsang's leave for purposes of performing consulting work for Sycamore Networks was approved by the University. Dkt. No. 177-7; see also Dkt. No. 246-9, at 6 (HKUST "Memorandum on Conditions of Service" allowing academic staff to take sabbatical leave "to undertake academic research and consultancy work").

As for the proviso of the Patent Policy cautioning employees "not to sign a conflicting patent agreement," that provision is precatory in nature, and it does not suggest that a violation of that provision would affect the employee's patent rights vis-à-vis the University. Moreover, there is no indication that the patent agreement Dr. Tsang entered into with Sycamore Networks

conflicted with the University's Patent Policy, because it related only to inventions Dr. Tsang developed during his tenure with Sycamore Networks while on approved sabbatical leave, and not to any inventions to which the University had any claim by virtue of its Patent Policy.

The Court thus concludes that the invention Dr. Tsang developed through his individual effort during the time he was on a University-approved, unpaid leave and was employed by Sycamore Networks is not covered by the provisions of the HKUST Patent Policy that would give rise to a claim on the University's part to a property interest in the '405 patent. For that reason, Dr. Tsang, like Dr. Azizoglu, was fully entitled to assign his interest in the patent. Sycamore IP, as full owner of the patent, therefore has standing to bring this action.

**2.** Sycamore IP makes the alternative argument that even if the University's Patent Policy gave the University rights with respect to Dr. Tsang's invention, the Patent Policy did not effect an automatic assignment of Dr. Tsang's rights to the University, but only imposed on him an obligation to assign his patent rights to the University. If that is the case, Sycamore IP argues, Dr. Tsang may have had a contractual obligation to assign his interest in the '405 patent to the University, but that contractual obligation did not abrogate Dr. Tsang's legal ownership interest in the patent at the time the patent issued or he assigned his interest in the patent to Sycamore Networks. The Court agrees with Sycamore IP: even if the Patent Policy were construed to apply to Dr. Tsang's invention, it would give the University, at most, a cause of action for breach of contract against Dr. Tsang, or an equitable claim of patent rights, but it would not have had the effect of abrogating Dr. Tsang's legal interest in the patent <u>ab initio</u>, nor would it have disabled him from assigning that legal interest to Sycamore Networks.

The distinction between a contractual provision that effects an automatic assignment of patent rights and a provision that is merely a promise to assign is well recognized in Federal

7

Circuit law. As the Federal Circuit has explained, "Whether an assignment of patent rights in an agreement is automatic or merely a promise to assign depends on the contractual language itself. If the contract expressly conveys rights in future inventions, no further act is required once an invention comes into being, and the transfer of title occurs by operation of law." <u>Abraxis Bioscience, Inc. v. Navinta LLC</u>, 625 F.3d 1359, 1364 (Fed. Cir. 2010) (citation omitted). In order to constitute a present assignment of all rights to future inventions, however, the contract must expressly provide for the assigning act to be effective at the time of the agreement, by using language such as "agrees to and does hereby grant and assign" or "I will assign and do hereby assign." <u>Gellman v. Telular Corp.</u>, 449 F. App'x 941, 944 (Fed. Cir. 2011); <u>Arachnid, Inc. v. Merit Indus., Inc.</u>, 939 F.2d 1574, 1580–81 (Fed. Cir. 1991) (agreement that all rights to certain inventions "will be assigned" is an agreement to assign, not a present assignment "effective to transfer all legal and equitable rights" to the invention).

Contrary to Level 3's contention, the pertinent clause in the University's Patent Policy does not use words such as "does hereby grant and assign" with respect to patent rights in which the University claims an interest. Instead, section 1.5 of the Patent Policy provides that Members of the University "<u>shall, as a condition of employment with the University, assign</u> all rights, title, and interest, to the extent prescribed in this policy, in any invention as defined herein to the University." That language does not contemplate an automatic assignment of rights, but rather reflects an anticipated undertaking by the covered Members of the University to take steps to assign patent rights to the University when the provisions of the Patent Policy so require.

Case law from the Federal Circuit confirms that language of the sort found in the University's Patent Policy does not constitute the present grant of an assignment to future-arising rights. For example, in <u>Gellman</u>, the contract stated that the employee "agrees to execute any

8

and all assignments or other transfer documents which are necessary . . . to vest in [the company] all right, title, and interest in such Work Products." 449 F. App'x at 943–44. The contract thus expressly contemplated that the employee would "execute any assignment" in the future; the contract itself did not effect the assignment. As the court explained, "[r]ather than expressly undertake assignment at signing, [the agreement] expressly delays assignment to some future date, when [the employee] would 'execute any and all assignments or other transfer documents' necessary to convey his rights to [the company]." Id. at 944–45.

Other Federal Circuit case law is to the same effect. In several cases, the court has determined that language such as "agree to assign" or "will be assigned" does not contemplate a present assignment of patent rights. E.g., Advanced Video Techs. LLC v. HTC Corp., 879 F.3d 1314, 1317–18 (Fed. Cir. 2018) ("will assign to the Company" does not create an immediate assignment); Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 583 F.3d 832, 841 (Fed. Cir. 2009) ("agree to assign" provided only a promise to assign the invention in the future); IpVenture, Inc. v. ProStar Computer, Inc., 503 F.3d 1324, 1327 (Fed. Cir. 2007) (same); Arachnid, 939 F.2d at 1580–81 ("will be assigned" does not constitute "a present assignment of an expectant interest"). By contrast, the court has determined that "do hereby assign" or "hereby grant" language is sufficient to effect an automatic transfer of later-arising patent rights. E.g., Bd. of Trs. of Leland Stanford Junior Univ., 583 F.3d at 842 ("I will assign and do hereby assign" is a present assignment); DDB Techs., L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 (Fed. Cir. 2008) (same for "agrees to and does hereby grant and assign"); Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1253 (Fed. Cir. 2000) (same for "shall belong" and "hereby conveys, transfers and assigns"); FilmTec Corp. v. Allied-Signal Inc., 939 F.2d 1568, 1570, 1573 (Fed. Cir. 1991) (same for "agrees to grant and does hereby grant").

9

Level 3 quotes from other portions of the Patent Policy to support its theory that any invention falling within the scope of the University's interests under the Patent Policy is automatically assigned to the University. But those portions of the policy do not support Level 3's argument. The first, a reference to "those cases where all rights are vested in the University," relates only to cases in which a sponsor and the University have agreed to assign all rights in a particular invention to the University. Patent Policy § 1.6.1. The second, which states that ownership of inventions developed as a result of University-assigned efforts "shall reside with the University" applies only to the limited circumstances in which an invention is the product of "assigned institutional effort," id. § 1.6.2, and does not apply to "University-Assisted Individual Effort," id. § 1.6.3, or to "Individual Effort," id. § 1.6.4, the category at issue in this case. Finally, the statement in the Patent Policy that the University "has vested the sole right to hold and, to transfer, the ownership of all intellectual properties (which term includes inventions and patents) generated by its faculty, students and employees in the Hong Kong University of Science and Technology RandD Corporation Limited," id. § 1.5, has nothing to do with the transfer of patent rights from inventors to the University, but merely states that whatever patent rights belong to the University will be held and administered by a University entity, the RandD Corporation. None of those provisions constitutes a present grant to the University of an inventor's rights in future inventions.

Level 3 next asserts that the foregoing line of Federal Circuit cases is inapposite, because Dr. Tsang's obligations to the University under the University's Patent Policy are governed by Hong Kong law. Under Hong Kong law, according to Level 3, language such as that in the Patent Policy constitutes a present assignment of future rights.

The Court rejects Level 3's reliance on Hong Kong law. As Sycamore IP points out, the Federal Circuit has long held that the question whether contractual language regarding patent assignment rights constitutes a present assignment of patent rights or a promise to assign patent rights in the future is a question of Federal Circuit law, not a question governed by the law otherwise applicable to the agreement between the parties. See Bd. of Trs. of Leland Stanford Univ., 583 F.3d at 841 ("[T]he question of whether contractual language effects a present assignment of patent rights, or an agreement to assign rights in the future, is resolved by Federal Circuit law."); DDB Techs., 517 F.3d at 1290 ("Although state law governs the interpretation of contracts generally, the question of whether a patent assignment clause creates an automatic assignment . . . is intimately bound up with the question of standing in patent cases," and that question is therefore treated "as a matter of federal law." (citation omitted)). Thus, Federal Circuit law makes clear that language such as the language in the HKUST's Patent Policy constitutes a promise to assign, not a present assignment of patent rights. For that reason as well, the Court concludes that Dr. Tsang was empowered to transfer his interest in the '405 patent to Sycamore Networks, and that, after further transfers, the rights in the '405 patent were all assigned to Sycamore IP. Accordingly, Sycamore IP has standing to bring this action and has no obligation under Rule 19 to join HKUST as a party.

The motion to dismiss is DENIED.

IT IS SO ORDERED.

SIGNED this 16th day of February, 2018.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE